Robert C. Schubert #62684
Willem F. Jonckheer #178748
Amber L. Schubert #278696
Sonum Dixit #353395
**SCHUBERT JONCKHEER & KOLBE LLP**
2001 Union Street, Suite 200
San Francisco, CA 94123
Tel: (415) 788-4220
Fax: (415) 788-0161
rschubert@sjk.law
wjonckheer@sjk.law
aschubert@sjk.law
sdixit@sjk.law

Christian Levis (*pro hac vice* forthcoming)
Amanda Fiorilla (*pro hac vice* forthcoming)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel: (914) 997-0500
Fax: (914) 997-0035
clevis@lowey.com
afiorilla@lowey.com

*Attorneys for Plaintiff and the Proposed Classes*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TARRA CHAMBERLAIN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>GRANOLA, INC. AND GRANOLA LABS LTD.<br><br>Defendants. | Case No.:  3:26-cv-07926<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Tarra Chamberlain ("Plaintiff"), individually and on behalf of all others similarly situated, asserts the following against Granola, Inc. and Granola Labs Ltd. (collectively, "Defendants" or "Granola") based upon personal knowledge, where applicable, information and belief, and the investigation of counsel.

## SUMMARY OF ALLEGATIONS

1.      This case concerns spyware. Granola designed and created an AI notetaking product that surreptitiously intercepts, records, and interprets the communications of every participant in virtual meetings without their knowledge or consent.

2.      Granola intentionally designed this software so that it need not be disclosed to those participating in virtual meetings. This is contrary to a majority of AI notetaking products on the market, where the AI notetaking software is made known before or at the start of the virtual meeting, many with the option to "boot" or "kick out" AI notetakers.

3.      Unlike its competitors, Granola purposefully created and designed its technology to do the opposite. Granola boasts that "[o]ther people in the room won't know" Granola's technology is intercepting, recording, processing, and using their communications as the "distinction that matters most" between Granola and other AI notetaking apps.[1]

4.      Worse, Granola does not merely passively record unknowing participants—a quintessential wiretap—but also, by default, uses the contents of those communications for its own commercial purposes, including training its AI systems. This setting can only be turned off by Granola users, which excludes individuals like Plaintiff and Class Members who did not authorize or consent to Granola's secret recording practices in the first place.

5.      Plaintiff and the Class are participants in conversations that were intercepted, recorded, transcribed in real time, and exploited by Granola, without their knowledge or consent. This conduct constitutes an extreme invasion of Plaintiff's and Class Members' privacy. It also violates each of the laws described herein.

6.      Given the secret and undisclosed nature of Defendants' conduct, additional evidence supporting Plaintiff's claims, including the full extent of the sensitive personal information Defendants intercepted and how they used that information, will be revealed in discovery.

---

[1] *More Than Just an AI Meeting Assistant*, Granola, https://www.granola.ai/ai-meeting-assistant (last visited July 27, 2026).

## PARTIES

**A.     Plaintiff**

7.     **Plaintiff Tarra Chamberlain** is a resident of Brevard County, Florida.

8.     Plaintiff Chamberlain frequently joins Microsoft Teams and Zoom meetings as part of her personal and professional life from her state of residence.

9.     Unbeknownst to Plaintiff Chamberlain, Granola's AI notetaking software was present in at least one of the Microsoft Teams and/or Zoom meetings joined by Plaintiff Chamberlain.

10.     Plaintiff Chamberlain was an active participant in this meeting and, without her consent, had the content of her communications unlawfully intercepted, recorded, and processed in real time by Granola.

11.     Upon information and belief, Granola exploited the content of these communications for its own benefit, including training its AI systems.

12.     Plaintiff Chamberlain did not consent to the sharing, use, and interception of her private communications, or the use of this information by Defendants or anyone else.

13.     Defendants' interception, recording, and use of the content of Plaintiff Chamberlain's private communications was privacy invasive.

14.     These privacy harms cannot be remedied solely through legal damages, as Defendants' use of Plaintiff Chamberlain's private data is ongoing and can never be fully remedied by virtue of how AI training is accomplished. Granola acknowledges this, stating that "data . . . incorporated into AI or analytics models or other databases will not be removed from those models and datasets, as removal may not be technically feasible without complete model retraining or database reconstruction."[2]

---

[2] *Privacy Policy*, Granola (July 24, 2026), https://docs.granola.ai/help-center/policies/privacy-policy.

3

**B.     Defendants**

15.     **Defendant Granola, Inc.** is a registered Delaware corporation located at 1151 Walker Rd, Suite 417, Dover, Delaware 19904.

16.     Granola, Inc., as the creator and developer of its AI notetaking software, was at all times aware of the privacy implications of recording and capturing consumers' private communications.

17.     Granola, Inc. knew that several of its competitors designed their AI notetaking technology to announce itself or otherwise make participants aware that the technology is present in virtual meetings.

18.     Despite this norm among industry participants—and the law—Granola, Inc. intentionally and purposefully designed its software so that meeting participants are not aware their communications are recorded, intercepted, and used by Granola, Inc.

19.     Indeed, Granola, Inc. frequently advertises this as a *benefit* of its technology, not a flaw.

20.     Thus, Granola, Inc., at all times, knew that it captured, intercepted, used, and stored consumers' communications because it controlled every part of this process. As such, Granola, Inc.'s conduct was intentional despite knowing the privacy violations it caused to Plaintiff and Class Members.

21.     **Defendant Granola Labs Ltd.** is a UK entity located at 4-6 Spicer Street, St. Albans AL3 4PQ, England.

22.     Granola Labs Ltd. is an affiliate of Granola, Inc.

23.     Granola, Inc., together with Granola Labs Ltd., provides the AI-powered notetaking software, including the associated mobile and desktop applications.

24.     As such, Granola Labs Ltd. was an active participant in capturing, intercepting, using, and storing consumers' private communications without their knowledge or consent, including from within California.

4

**JURISDICTION AND VENUE**

25.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d), because the amount in controversy for the Classes exceeds $5,000,000 exclusive of interest and costs, there are more than 100 putative members of the Classes defined below, and a significant portion of putative Class Members are citizens of a state different from the Defendants.

26.    This Court also has federal-question jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts a claim arising under the laws of the United States, namely the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq*.

27.    This Court has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy under Article III of the United States Constitution.

28.    This Court has personal jurisdiction over Granola because Granola has purposefully availed itself of the privileges of conducting business in California and this District.

29.    Granola admits that it serves a "predominantly US customer base."[3] To "support that growth" Granola "opened a San Francisco office as the hub for [its] North American go-to-market efforts."[4]

30.    Granola frequently recruits and hires employees in California. Granola's employees, responsible for developing and offering its technology in California and the United States, work "in-person from [Granola's] office in San Francisco."[5]

31.    Granola hosts events from within California, including San Francisco, where individuals can chat with the Granola "AI team."[6]

---

[3] *Account Executive, Mid Market*, Granola, https://jobs.ashbyhq.com/granola/13670a9a-2f49-48f3-9b15-1399d00aef9d (last visited July 27, 2026).

[4] *Id.*

[5] *Id.*

[6] Granola, LinkedIn, https://www.linkedin.com/company/meetgranola/posts/?feedView=all&viewAsMember=true (last visited July 27, 2026); Granola, *The Next Cafe Granola Is in San Francisco*, LinkedIn, https://www.linkedin.com/posts/meetgranola_25-users-interviews-in-3-hours-thanks-to-activity-7481031864577736704-

5

32.     Granola regularly markets and promotes its products to California entities, including through physical billboards placed in San Francisco.[7] Several of these entities are now Granola customers, including Brex, Vercel, and Vanta, each of which is located in San Francisco, California.[8]

33.     Granola stores all personal data collected through its technology on servers within the United States, and its user agreements voluntarily select California law to govern claims against Granola and contain a California venue provision.[9]

34.     Moreover, a substantial part of the events giving rise to Plaintiff's claims—including the interception, recording, and transcription of Plaintiff's private communications—occurred in and were directed at this State where Plaintiff resides.

35.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, and because Granola maintains operations in and is subject to personal jurisdiction in this District.

36.     **Divisional Assignment**: This action arises in San Francisco County, in that a substantial part of the events which give rise to the claims asserted herein occurred in San Francisco

---

xOoX?utm_source=share&utm_medium=member_desktop&rcm=ACoAADSvAjIBAvzlPtxrxNh TCqGtt3oN7ewjh6A (last visited July 27, 2026); Granola, *Scenes from San Francisco*, LinkedIn, https://www.linkedin.com/posts/meetgranola_scenes-from-san-francisco-we-loved-being-activity-7394464816691695616-GzFA?utm_source=share&utm_medium=member_desktop&rcm=ACoAABbMro4B-5nNOdpedZPRFOR6Z6e4p8MdJy8 (last visited July 27, 2026); Granola, *We're Visiting San Francisco!*, LinkedIn, https://www.linkedin.com/posts/meetgranola_were-visiting-san-francisco-and-wed-love-activity-7387390033143578624-jAGl?utm_source=share&utm_medium=member_desktop&rcm=ACoAABbMro4B-5nNOdpedZPRFOR6Z6e4p8MdJy8 (last visited July 27, 2026).

[7]     Granola, *We Put Up Our First Billboards in SF*, LinkedIn, https://www.linkedin.com/posts/meetgranola_we-put-up-our-first-billboards-in-sf-the-activity-7429211518098882560-tKF8?utm_source=share&utm_medium=member_desktop&rcm=ACoAADSvAjIBAvzlPtxrxNhT CqGtt3oN7ewjh6A (last visited July 27, 2026).

[8] *Helping our Customers Stay Present in Meetings*, Granola, https://www.granola.ai/customers (last visited July 27, 2026).

[9] *User Terms of Service*, Granola (Dec. 19, 2025), https://docs.granola.ai/help-center/policies/terms-of-service/user-terms-of-service.

County. Pursuant to L.R. 3-2(d), all civil actions that arise in San Francisco County shall be assigned to the San Francisco or Oakland Division.

## FACTUAL BACKGROUND

### A.    Background of Granola and its AI Notetaking Software

37.    Granola was founded by Christopher Pedregal and Sam Stephenson.[10] The company began by offering a six-month beta to approximately 150 users, from which Granola tested certain features, some of which would ultimately be included in the company's core product.[11]

38.    Granola publicly launched its notetaking software in May 2024.[12] Granola Labs Ltd., the company's United Kingdom software-development entity, was incorporated on March 3, 2023, and Pedregal and Stephenson have served as its only directors since its formation.[13]

39.    In 2024, Granola announced a $20 million Series A financing.[14] It then raised an additional $43 million at a reported valuation of approximately $250 million.[15] On March 25, 2026, Granola announced a further $125 million Series C financing.[16] That financing increased Granola's valuation to approximately $1.5 billion.[17]

40.    Granola's core product is its AI notetaking software, for which Granola offers

[10] *Generative London: How to Win AI's App Layer, with Granola*, Lightspeed Venture Partners (May 15, 2025), https://lsvp.com/stories/generative-london-how-to-win-ais-app-layer-with-granola.
[11] *Id.*
[12] Chris Pedregal, *Granola Raises $20M to Build the AI Notepad that Makes You Smarter*, Granola (Oct. 23, 2024), https://www.granola.ai/blog/series-a.
[13] *Granola Labs LTD*, Companies House, https://find-and-update.company-information.service.gov.uk/company/14703652/officers (last visited July 27, 2026).
[14] Pedregal, *supra* note 12.
[15] Ivan Mehta, *AI Notetaking App Granola Raises $43M at $250M Valuation, Launches Collaborative Features*, TechCrunch (May 14, 2025), https://techcrunch.com/2025/05/14/ai-note-taking-app-granola-raises-43m-at-250m-valuation-launches-collaborative-features/; Ivan Mehta, *Granola Raises $125M, Hits $1.5B Valuation As It Expands From Meeting Notetaker to Enterprise AI App*, TechCrunch (Mar. 25, 2026), https://techcrunch.com/2026/03/25/granola-raises-125m-hits-1-5b-valuation-as-it-expands-from-meeting-notetaker-to-enterprise-ai-app/.
[16] Chris Pedregal, *Granola Raises $125M to Put Your Company's Context to Work*, Granola, https://www.granola.ai/blog/series-c (last visited July 27, 2026).
[17] *Id.*

desktop (macOS or Windows) and iPhone/Android apps.[18] Once installed, a Granola user can easily enable the AI notetaking software directly from their calendar to intercept, record, and transcribe virtual meetings on Google Meet, Zoom, Microsoft Teams, and more.

**FIGURE 1[19]**



41.    A Granola user can also click a "+ New Note" button from the app to begin recording an impromptu call that is not scheduled on their calendar.[20] And Granola can record in-person conversations.

42.    By default, Granola does not disclose to meeting participants that their communications are intercepted, recorded, and used by Granola. That Granola's wiretapping technology is not announced to meeting participants—and secretly records in the background—is not a bug; it is by design.

**FIGURE 2**

Most tools also join as a visible bot, which changes the conversation. People speak differently when a recorder is in the room - especially in client calls, interviews, or early-stage discussions.

The best version of an AI meeting assistant doesn't attend your meetings. It makes them more useful before, during, and after.

---

[18] *How Transcription Works*, Granola, https://docs.granola.ai/help-center/taking-notes/transcription (last visited July 27, 2026).
[19] Matt Leppington, *Granola AI Review: My Honest Thoughts After 20+ Meetings (2026)*, tldv.io (June 23, 2026), https://tldv.io/blog/granola-review/.
[20] *How Transcription Works*, *supra* note 18.

8

43.    Granola actively advertises the hidden nature of its technology as one of its primary selling points. When comparing Granola to other AI meeting assistants, "[n]o bot joins your call" is listed second.

**FIGURE 3**

44.    Elsewhere, Granola continues to advertise the secretive nature of its technology, stating "No bot joins the call. No notification appears. Nothing changes about the room, except that you'll have better notes when it's over."[21]

45.    If that was not clear enough, Granola states explicitly on its website that this is the "distinction that matters most"—"*[o]ther people in the room won't know it's there*."[22]

**FIGURE 4**

For most knowledge workers, the distinction that matters most: Granola doesn't change the meeting. Other people in the room won't know it's there.

46.    Granola's customers range from established enterprises to startups, including companies such as Vanta, Gusto, Thumbtack, Asana, Cursor, Lovable, Decagon, and Mistral AI.[23]

47.    Plaintiff and Class Members are individuals who were recorded by Granola's AI notetaking software without their knowledge or consent.

---

[21] *More Than Just an AI Meeting Assistant*, *supra* note 1.
[22] *Id*.
[23] Pedregal, *supra* note 16.

**B.      How Granola AI's Notetaking Feature Works**

48.      To create meeting notes, Granola uses the computer's "system audio and microphone" to capture and transcribe the participants' communications.[24] When the Granola user speaks, Granola captures the communication through the computer's microphone input. When other meeting participants speak, Granola captures their communications through the computer's system-audio output.

49.      Because Granola "uses [the] system audio to capture transcription," it "captur[es] whatever audio inputs and outputs happen on [the] computer," and "can transcribe any call where the audio plays through your computer—including calls from VoIP or internet calling apps."[25]

50.      Granola's technology "passes [the] audio directly from your microphone and system audio" to its transcription vendor—who acts at Granola's direction and as its agent—for the express purpose of creating the AI transcription.[26]

51.      This acquisition, transmission, and processing occurs contemporaneously with the underlying communications. As the participants speak, Granola captures their "live" communications and uses the intercepted communication to generate and display a real-time transcript while the meeting is still taking place and before the communications have come to rest.[27]

52.      Indeed, Granola's own description confirms that it does not obtain the communications from storage after they have come to rest. Granola expressly states that it "does not record or save audio or video at any point during the call[.]"[28] Nor does it allow transcription of previously recorded audio files. Instead, it "passes audio directly from your microphone and system audio" and uses that audio to generate a "live transcript" during the ongoing meeting.[29] Thus, by Granola's own account, it acquires and processes the communications in real time as they are being transmitted and received—not later from a stored recording.

---

[24] *How Transcription Works*, *supra* note 18.
[25] *Id*.
[26] *Id*.
[27] *Id*.
[28] *Id*.
[29] *Id*.

53. Granola further processes the intercepted communications to determine and record which participant made each statement. Through its "speaker tags" feature, Granola "label[s] who said what" in the live transcript using "each participant's display name[.]"[30] When Granola identifies a participant as the speaker, that person's name appears directly above the corresponding portion of the intercepted conversation, rather than the transcript merely identifying the audio as originating from "Me" or "Them."[31]

54. This attribution also occurs contemporaneously with the underlying communication. After the user begins transcription with speaker tags configured, Granola directs the user to open the transcript panel to view "live transcription with speaker names."[32] Granola expressly states that speaker tags apply only "while Granola is actively transcribing" and cannot retroactively add names to older transcripts.[33] Thus, while Granola is capturing and transcribing the ongoing conversation, it simultaneously associates the captured statements with the identities displayed by the meeting platform.

55. Even when speaker tags are unavailable, Granola continues to classify the intercepted communications according to their source. Its transcripts identify the Granola user's microphone input as "Me" and the system audio carrying the other participants' communications as "Them."[34]

56. Granola further states that "even then," however, its AI can "infer[] speakers from contextual clues in the transcript," after which the user may correct a participant's name or direct Granola Chat to update the attribution.[35]

57. Granola's speaker-attribution feature therefore performs a separate layer of contemporaneous processing and use of the intercepted communications. As Granola acquires the participants' live audio and converts it into text, it also analyzes the source and context of each

---

[30] *Speaker Tags*, Granola, https://docs.granola.ai/help-center/taking-notes/speaker-attribution (last visited July 27, 2026).
[31] *Id.*
[32] *Id.*
[33] *Id.*
[34] *Id*.
[35] *Id.*

11

statement and associates that statement with a named or otherwise classified speaker. The resulting transcript preserves not only the contents of the participants' communications, but also Granola's identification of the person who made each statement.

**C. Granola Cannot Escape its Legal Obligations by Attempting to Pass Them Off to Granola Users**

58. Granola has a legal obligation not to create, design, or offer for sale unlawful wiretapping technology and, separately, an obligation not to intercept, process, and use communications obtained through the same.

59. Granola nevertheless attempts to shift the responsibility for lawful operation of its product to the customer, despite that its technology is—by design—unlawful. Granola states that customers "remain responsible for determining what notice or consent is required for their use case and jurisdiction."[36] Granola similarly leaves it to users or workspace administrators to decide whether to activate its purported "transparency features."[37]

60. Those features are not inherent in Granola's transcription process: users "can enable one or both," either individually or across a workspace.[38] Granola's first option causes Granola to post a meeting-chat message after it begins transcribing; its second displays a "Granola Watermark" on the user's video. Granola also suggests that customers may separately configure Zoom or Microsoft Teams to provide additional notice, but expressly states that "Granola does not configure these settings on behalf of customers[.]"[39]

61. Granola's creation of these features demonstrates it has actual knowledge that meeting participants ordinarily do not know that Granola is eavesdropping on their communications

---

[36] *Security, Privacy & Data FAQs*, Granola, https://docs.granola.ai/help-center/consent-security-privacy/security-privacy-data-faqs#how-do-i-get-consent-from-meeting-participants (last visited July 27, 2026).

[37] *Let People Know You're Using Granola*, Granola, https://docs.granola.ai/help-center/consent-security-privacy/transparency-solutions/introduction (last visited July 27, 2026); *When to Use AI Notetaking: A Guide for Your Team*, Granola, https://docs.granola.ai/help-center/consent-security-privacy/getting-consent (last visited July 27, 2026).

[38] *Let People Know You're Using Granola*, *supra* note 37.

[39] *Id*.

12

when the AI notetaking software is running using the default settings. Granola describes the features as necessary "to make it clear to meeting participants that notes are being captured" and "to let everyone know" when Granola begins transcribing.[40] Those descriptions necessarily recognize that, absent an affirmative notification, Granola's operation is not otherwise clear to the persons whose communications it captures.

62.    Despite this, Granola chose not to make either form of notice a regular part of the product's transcription process. Instead, it permits customers to enable "one or both" features, thereby allowing Granola to capture and process communications without either notice mechanism operating.[41]

63.    The optional nature of Granola's transparency features is especially revealing because Granola markets the absence of a visible meeting bot as a defining feature of its product, as described above in Section A.

64.    As noted in that Section, Granola advertises that, unlike its competitors who use "bots" that announce themselves, it takes a "different approach" where there is "***No bot. No notification***."[42]

\*    \*    \*

---

[40] *Id.*

[41] *Id.*

[42] *More Than Just an AI Meeting Assistant*, *supra* note 1.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

**FIGURE 5**[43]

Granola's meeting assistant takes a different approach than bot-centered tools. Our AI notepad runs on your device, captures your meeting audio locally, and combines what you heard with the notes you actually took. When the call ends, you instantly get clean, editable notes, not a wall of transcript. No bot. No notification. No one else in the room.

65.    Elsewhere on its website, Granola makes clear this is not by accident, but by design. As explained by Granola, "[m]ost tools also join as a visible bot, which changes the conversation. People speak differently when a recorder is in the room – especially in client calls, interviews, or early-stage discussions."[44] Per Granola, the "best version of an AI meeting assistant" is the unannounced one—the eavesdropping software it makes available.[45]

66.    By marketing this as a selling point, Granola acknowledges the secretive, undisclosed nature of its spyware technology is not a bug, but an intentional feature. It cannot disclaim liability by simply asserting its customers should have used the technology in a way other than Granola originally intended.

**D.    Granola Compounds the Number of Privacy Violations by Disclosing Data and Transcripts to Third Parties**

67.    After intercepting and processing meeting communications, Granola enables its users to disclose the resulting meeting data to individuals who neither participated in, nor consented

---

[43] *Id.*
[44] *Id.*
[45] *Id.*

14

to, the underlying communication.

68.     Granola allows a user to generate a unique URL for a meeting note and configure that link so that "Anyone with the link" can view the notes.[46] Granola characterizes this setting as "public" and confirms that, when enabled, the link may be shared outside the user's company.[47]

69.     A recipient's access does not depend on having a paid Granola subscription, and Granola permits even non-Granola users to view publicly shared materials through a web browser.

70.      A person who obtains such a link may read Granola's AI-generated account of the meeting, hover over portions of the notes to obtain additional context derived from the underlying transcript, and use Granola Chat to ask further questions about what occurred during the meeting.[48]

71.     Granola thus enables additional third parties who were not present for the communication to view, read, use, and extract information from the intercepted communications.

72.     Granola also facilitates additional disclosure through integrations with email, Slack, Notion, HubSpot, Affinity, Attio, and Zapier.[49] When a note is shared to Slack, for example, Granola can post both a link and a summary of the meeting directly into the selected Slack channel.[50]

73.     Granola admits that the summary becomes part of the Slack message itself and remains visible even if the user later changes the underlying Granola note to "Private."[51] Where the note is configured for "Anyone with the link" access, Slack may also retrieve and display the meeting title, attendees, date, and a summary excerpt in a publicly fetchable link preview.[52]

74.     This compounds the privacy violations to Plaintiff and the Class through these additional disclosures facilitated by Granola.

[46] *Sharing Controls*, Granola, https://docs.granola.ai/help-center/consent-security-privacy/sharing-controls (last visited July 27, 2026); *Spaces & Folders*, Granola, https://docs.granola.ai/help-center/sharing/folders/spaces-and-folders (last visited July 27, 2026).
[47] *Sharing Notes*, Granola, https://docs.granola.ai/help-center/sharing/sharing-notes (last visited July 27, 2026); *Sharing Controls*, *supra* note 46; *Spaces & Folders*, *supra* note 46.
[48] *Sharing Notes*, *supra* note 47.
[49] *Id*.
[50] *Slack*, Granola, https://docs.granola.ai/help-center/sharing/integrations/slack (last visited July 27, 2026); *Sharing Notes*, *supra* note 47.
[51] *Id*.
[52] *Id*.

15

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

**E.      Plaintiff and Class Members have a Reasonable Expectation of Privacy in their User Data**

75.      Plaintiff and Class Members have a reasonable expectation of privacy in their private communications, especially those revealing sensitive content.

76.      Privacy polls and studies uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' personal data.

77.      For example, a study by *Consumer Reports* shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believe internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[53] Moreover, according to a study by *Pew Research Center*, a majority of Americans, approximately 81%, are concerned about how companies use the data they collect about them.[54]

78.      Users act consistent with these preferences. Following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85% of worldwide users and 94% of U.S. users chose not to share data when prompted.[55]

79.      Another recent study by DataGrail revealed that 67% of people were willing to pay $100 or more annually to keep their information out of the hands of companies and the government.[56] The same study revealed that 75% of people would abandon brands that do not take

---

[53] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, Consumer Reports (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/.

[54] Colleen McClain *et al.*, *How Americans View Data Privacy*, PEW RSCH. CTR. (Oct. 18, 2023), https://www.pewresearch.org/internet/2023/10/18/how-americans-view-data-privacy/.

[55] Estelle Laziuk, *iOS 14.5 Opt-in Rate - Daily Updates Since Launch*, Flurry (Apr. 29, 2021), https://www.flurry.com/blog/ios-14-5-opt-in-rate-att-restricted-app-tracking-transparency-worldwide-us-daily-latest-update.

[56] New DataGrail Research, The Great Privacy Awakening, Underscores How Far People are Willing to Go to Protect Their Personal Information in Absence of Federal Regulations, DataGrail (Oct. 27, 2022), https://www.datagrail.io/press/new-datagrail-research-the-great-privacy-awakening/.

16

care of their data.[57]

80.    Regulators have also raised concerns about similar privacy-invasive practices. For instance, a German privacy watchdog—the Hamburg Data Protection Authority ("DPA")—raised privacy concerns back in August 2019 when Google began sharing audio recordings from its voice assistant with contractors for manual review to improve its speech technology, similar to how Granola uses Plaintiff's and Class Members' communications to improve its own services without consent. The Hamburg DPA criticized these practices as inconsistent with the General Data Protection Regulation ("GDPR") and privacy expectations, noting there were "significant doubts" that the secret use of contractors to conduct a manual review of private audio recordings complied with this law.[58]

81.    The United Kingdom's Information Commissioner's Office has raised similar concerns relating to how companies collecting audio and video use this data. This entity told *BBC News* that "[s]ervice providers must clearly explain what data is collected and how it is used."[59] Granola, which secretly recorded, intercepted, and used Plaintiff's and the Class's private communications, did not do so.

82.    That regulators have criticized these practices confirms they are inconsistent with reasonable expectations of privacy.

**F.    Granola Profits from AI and ML Training**

83.    Data suitable for training artificial-intelligence and machine-learning models is a valuable commercial asset.[60]

84.    For instance, Google recently licensed content from Reddit to train its AI models for

---

[57] *Id*.

[58] Natasha Lomas, *Google Ordered to Halt Human Review of Voice AI Recordings Over Privacy Risks*, TechCrunch (Aug. 2, 2019), https://techcrunch.com/2019/08/02/google-ordered-to-halt-human-review-of-voice-ai-recordings-over-privacy-risks/.

[59] Chris Vallance, *Regulator contacts Meta over workers watching intimate AI glasses videos*, BBC News (Mar. 4, 2026), https://www.bbc.com/news/articles/c0q33nvj0qpo.

[60] Katie Paul & Anna Tong, *Inside Big Tech's Underground Race to Buy AI Training Data*, Reuters (Apr. 5, 2024), https://www.reuters.com/technology/inside-big-techs-underground-race-buy-ai-training-data-2024-04-05/.

17

$60 million a year.[61] Reddit represents that it made over $200 million licensing this data to entities altogether.[62]

85.    Other companies similarly commercialize data for AI and machine-learning development. Stack Overflow and Shutterstock likewise charge AI companies to license their data.[63] Similarly, Photobucket has discussed with "multiple tech companies" licensing the photos and videos on its platform, with prices ranging from $0.50-$1.00 per photo and more than $1 per video.[64]

86.    Granola similarly derives commercial value from the communications it intercepts. Granola expressly admits that it uses data collected and intercepted through its technology "so we can keep making Granola better."[65]

87.    Thus, Granola does not use the intercepted communications solely to provide a transcript or notes to the particular user who initiated the interception. It also repurposes data derived from those communications to develop and improve the models supporting Granola's commercial product.[66]

88.    Granola's Privacy Policy confirms that the data available for such use originates from the private communications captured through its service. Granola identifies the personal data it collects as including "[r]ecordings and transcriptions of communications captured through our Services" and "[m]eeting data, including but not limited to attendees, audio, and transcriptions."

[61] Anna Tong, *et al., Exclusive: Reddit in AI content licensing deal with Google*, Reuters (Feb. 21, 2024), https://www.reuters.com/technology/reddit-ai-content-licensing-deal-with-google-sources-say-2024-02-22/.

[62] Kyle Wiggers, *Reddit Says It's Made $203M So Far Licensing Its Data*, TechCrunch (Feb. 22, 2024), https://techcrunch.com/2024/02/22/reddit-says-its-made-203m-so-far-licensing-its-data/.

[63] Paresh Dave, *Stack Overflow Will Charge AI Giants for Training Data*, Wired (Apr. 20, 2023), https://www.wired.com/story/stack-overflow-will-charge-ai-giants-for-training-data/;
*Shutterstock Builds on Data Licensing Strength with New AI Services for Model Training and Evaluation*, Shutterstock (Oct. 7, 2025), https://investor.shutterstock.com/news-releases/news-release-details/shutterstock-builds-data-licensing-strength-new-ai-services.

[64] Katie Paul & Anna Tong, *supra* note 60.

[65] *Security, Privacy, and How it All Works*, Granola, https://www.granola.ai/security (last visited July 27, 2026).

[66] *Security, Privacy, and How it All Works*, *supra* note 65; *Profile and Preferences*, Granola, https://docs.granola.ai/help-center/customising-granola/profile-and-preferences (last visited July 27, 2026).

18

Granola states that it may create purportedly "de-identified" or anonymized data[67] from the personal data it collects and use that resulting data to "train AI models."[68] It also broadly claims the right to use personal data—deidentified or not—to "personalize" user interactions, including serving advertisements, to "understand [its] Services," and to "improve the quality of and to develop new products and services."[69]

89.    This model-training use is enabled by default for users on Granola's Free and Business plans. Granola states that, "[b]y default on Free and Business plans, anonymised data may be used for Granola's own model improvements."[70] A Granola user must affirmatively navigate to the application's settings and disable the option labeled "Use my data to improve models for everyone" to prevent future model training.[71] On Business plans, each individual user must opt out separately.

90.    Granola therefore treats the private communications it captures as training data unless the Granola account holder takes affirmative steps to prevent that secondary use. Granola further admits that, even when a user later opts out, it "cannot guarantee that anonymised data wasn't used before you changed the setting."[72] The opt-out is prospective only: Granola promises merely that, after the setting is changed, the user's data will not be used for "future model training."[73]

91.    The individuals whose communications supply this training data (i.e., Plaintiff and Class Members), however, are not Granola users. Thus, they have no control over what Granola does with their data that Granola secretly intercepts and uses.

92.    Worse, once Granola feeds this data into its AI model training, there is no way to extract the data. Granola admits this: "Once training is complete, it is not technically possible to

---

[67] Granola does not explain what it considers de-identified or anonymous data, such as whether its definition includes persistent user identifiers or other information that can, and is, used to identify individuals.

[68] *Privacy Policy*, *supra* note 2.

[69] *Id.*

[70] *Security, Privacy & Data FAQs*, *supra* note 36.

[71] *Id.*

[72] *Id.*

[73] *Id.*

19

isolate or extract any specific data from the resulting model."[74]

93.     Granola's use of the intercepted communications for model training confers a direct commercial benefit upon Granola. The resulting data allows Granola to test, train, evaluate, and improve the models underlying its transcription, summarization, note-generation, and other AI-based features; enhance the quality of the product offered to all users; attract and retain subscribers; and increase the value and revenue-generating capacity of its business. Granola obtains those benefits without compensating Plaintiff and Class Members whose private communications supplied the underlying training material.

### G.     Defendants Do Not Adhere to "Best Practices"

94.     The most fundamental best practices for privacy are enshrined in the Fair Information Practice Principles ("FIPPs"), most of which form the foundation for the Federal Trade Commission's enforcement of fraudulent and unfair privacy-related business practices.[75]

95.     The FIPPs originated in a 1973 U.S. government report—the HEW Report published by the U.S. Department of Health, Education & Welfare—and have since been adopted by multiple agencies.[76]

96.     Among these principles are: (1) a mandate that companies should clearly disclose what data is used, how it is used, and who it is shared with; (2) the need for companies to obtain consent to collect, use, or access data; (3) a prohibition on using information shared for one purpose for other undisclosed purposes; (4) a prohibition on using data for undisclosed purposes without obtaining additional consent; and (5) the idea of data minimization, which means that data should only be collected and stored for as long as necessary for the stated purpose.[77]

97.     A 2012 FTC Report, titled *Protecting Consumer Privacy in an Era of Rapid Change*, also mirrors the FIPPs, calling for transparency, clear consumer disclosures and choice, as well as

[74] *Privacy Policy*, *supra* note 2.
[75] *Privacy Policy Guidance Memo.: The Fair Information Practice Principles\*, Dep't of Homeland Sec.        (Dec.        29,        2008)        https://www.dhs.gov/sites/default/files/2024-01/Fair%20Information%20Principles_12_2008.pdf.
[76] *Id.*
[77] *Id.*

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

the concept of "privacy by design."[78]

98.    The National Institute of Standards and Technology uses a similar framework, expressly mirrored off the FIPPs, and the Organization for Economic Co-operation and Development (OECD) has adopted its own OECD Principles that closely mirror FIPPs.

99.    Many of these best practices have also been codified into law, including in the GDPR and California Consumer Privacy Act ("CCPA").

100.    Granola did not adhere to these best practices. Granola did not disclose that it would record, intercept, and use consumers' private communications, nor did it provide consumers with any choice in the matter.

101.    Granola did not adhere to "best practices" specific to the AI notetaking industry either. Granola's competitors have (1) ensured that their technology is disclosed and made known to meeting participants, often with the feature to "kick out" AI notetaking bots from meetings altogether; and (2) that meeting notes are not used to train its own AI systems. Granola does the opposite.

102.    For instance, Granola competitor tl;dv makes clear that "Your recordings and transcripts are yours (not ours). ***And we'll never, ever use them to train AI. Ever***."[79] Meanwhile, competitor Fireflies, by default, alerts participants they are being recorded and provides multiple ways for users to avoid this.[80]

103.    This confirms that industry practice increasingly favors obtaining consent prior to recording, intercepting, using, or storing individuals' private communications. Granola did not adopt these practices.

---

[78] *Protecting Consumer Privacy in an Era of Rapid Change: Recommendations For Businesses and Policymakers*, Fed. Trade Comm'n (Mar. 2012), https://www.ftc.gov/sites/default/files/documents/reports/federal-trade-commission-report-protecting-consumer-privacy-era-rapid-change-recommendations/120326privacyreport.pdf.
[79] *The AI Notetaker Built for Team Collaboration*, tl;dv, https://tldv.io/ (last visited July 27, 2026).
[80] Medha Bhatt, *Ensuring Meeting Compliance with Fireflies AI Notetaker* (Nov. 22, 2022), https://fireflies.ai/blog/meeting-compliance-with-fireflies/.

**TOLLING**

104.    The applicable statutes of limitation have been tolled as a result of Defendants' knowing and active concealment and denial of the facts alleged herein.

105.    Defendants' knowing and active concealment and denial of the facts alleged herein toll any applicable statute(s) of limitations. Plaintiff and Class Members could not reasonably have discovered the true nature and extent of Granola's collection, transmission, storage, and use of data captured through its AI notetaking software until the facts alleged herein became known.

106.    Plaintiff and Class Members had no reasonable ability to discover, within the applicable statute of limitations, that Defendants were engaging in this conduct because Defendants purposefully designed their technology to operate in the background in a manner undisclosed to meeting participants. Plaintiff learned of this conduct only shortly before the filing of this action.

107.    Any statutes of limitation otherwise applicable to any claims asserted herein thus have been tolled by the discovery rule.

108.    All applicable statutes of limitations have also been tolled by Defendants' knowing, active, and ongoing fraudulent concealment of the material facts alleged herein.

109.    Defendants had a duty to disclose, among other things, the true scope and nature of the data collection, transmission, retention, and use practices associated with their AI notetaking software. Defendants were the only entities with the knowledge and ability to ensure this software was disclosed, and consumers consented, prior to the use of this technology.

110.    Despite this duty, Defendants actively concealed these material facts from Plaintiff and Class Members.

111.    As a result of Defendants' active concealment, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

**CLASS ACTION ALLEGATIONS**

112.    Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Classes:

22

**Nationwide Class:** All persons in the United States or its Territories whose communications were recorded, intercepted, and/or used by Granola.

**California Subclass:** All persons in California whose communications were recorded, intercepted, and/or used by Granola.

113. Excluded from the Classes are: (1) any Judge or Magistrate presiding over this action and any members of their immediate families; (2) the Defendants, Defendants' subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiff's counsel and Defendants' counsel.

114. **Numerosity:** The exact number of members of the Classes is unknown and unavailable to Plaintiff at this time, but individual joinder in this case is impracticable. The Classes likely consist of millions of individuals, and the members can be identified through Defendants' records.

115. **Predominant Common Questions:** The Classes' claims present common questions of law and fact, and those questions predominate over any questions that may affect individual Class Members. Common questions for the Classes include, but are not limited to, the following:

- Whether Defendants violated Plaintiff's and Class Members' privacy rights;
- Whether Defendants' acts and practices violated common law invasion of privacy;
- Whether Defendants were unjustly enriched;
- Whether Defendants' acts and practices violated the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq.*;
- Whether Defendants' acts and practices violated the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq.*
- Whether Plaintiff and the Class Members are entitled to equitable relief, including but not limited to, injunctive relief, restitution, and disgorgement; and
- Whether Plaintiff and the Class Members are entitled to actual, statutory,

23

punitive or other forms of damages, and other monetary relief.

116. **Typicality:** Plaintiff's claims are typical of the claims of the other members of the Classes. The claims of Plaintiff and the members of the Classes arise from the same conduct by Defendants and are based on the same legal theories.

117. **Adequate Representation:** Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Classes. Plaintiff has retained counsel competent and experienced in complex litigation and class actions, including litigations to remedy privacy violations. Plaintiff has no interests that are antagonistic to the interests of the Classes, and Defendants have no defenses unique to Plaintiff. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes, and they have the resources to do so. Neither Plaintiff nor her counsel have any interest adverse to the interests of the other members of the Classes.

118. **Substantial Benefits:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Classes is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

119. Plaintiff reserves the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

<u>**CLAIMS FOR RELIEF**</u>

**FIRST CLAIM FOR RELIEF**
**Violation of Common Law Invasion of Privacy – Intrusion Upon Seclusion**
**(On Behalf of the Plaintiff and the Nationwide Class)**
**(Against All Defendants)**

120. Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

24

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

121.    A plaintiff asserting claims for intrusion upon seclusion must plead (1) that the defendant intentionally intruded into a place, conversation, or matter as to which Plaintiff has a reasonable expectation of privacy; and (2) that the intrusion was highly offensive to a reasonable person.

122.    Plaintiff and Class Members have a reasonable expectation of privacy in private conversations and meetings. Plaintiff and Class Members reasonably expected this information would remain private and confidential and would not be intercepted or collected by third parties without their consent.

123.    Likewise, Plaintiff and Class Members have a reasonable expectation of privacy that their private conversations would not be used without their knowledge or consent and, particularly, not to train AI models.

124.    Granola's interception and collection of Plaintiff's and Class Members' confidential communications constitutes an intentional intrusion upon Plaintiff's and Class Members' solitude or seclusion.

125.    Granola's use of Plaintiff's and Class Members' private communications and audio—as well as transcribed versions of this data—to train AI models also constitutes an intentional intrusion upon Plaintiff's and Class Members' solitude or seclusion.

126.    The surreptitious interception and use of confidential and private data from unsuspecting individuals was highly offensive because it violated expectations of privacy that have been established by social norms. Privacy polls and studies show that the overwhelming majority of Americans believe one of the most important privacy rights is the need for an individual's affirmative consent before personal data is collected or shared.

127.    The offensiveness of this conduct is all the more apparent because Defendants' interception and use of this information was conducted in secret in a manner that Plaintiff and Class Members would be unable to detect.

128.    Training AI models using data without consent is particularly egregious, and against privacy expectations, because of the opaque nature of AI models. Once data is incorporated into

25

these models, it becomes extraordinarily difficult, if not practically impossible, to identify, isolate, or remove because of their "black box" nature. As a result, individuals have no meaningful ability to ever reclaim control over their personal information.

129.    Plaintiff and Class Members did not consent to, authorize, or know about Defendants' intrusion at the time it occurred. Accordingly, Plaintiff and Class Members never agreed that Defendants could intercept or use their data.

130.    As a result of Defendants' actions, Plaintiff and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

131.    Plaintiff and Class Members have been damaged as a direct and proximate result of Defendants' privacy invasions and are entitled to just compensation, including monetary damages. Plaintiff and Class Members seek all appropriate relief for that injury, including but not limited to damages and all other relief that may be just or proper.

132.    Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendants' actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights.  Such damages are needed to deter Defendants from engaging in such conduct in the future.

**SECOND CLAIM FOR RELIEF**
**Violation of the Electronic Communications Privacy Act ("ECPA")**
**18 U.S.C. § 2510, *et seq***
**(On Behalf of the Plaintiff and the Nationwide Class)**
**(Against All Defendants)**

133.    Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

134.    The ECPA prohibits, among other things, (1) intentionally intercepting, endeavoring to intercept, or procuring any other person to intercept or endeavor to intercept any wire, oral, or electronic communication; (2) intentionally using, endeavoring to use, or procuring any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication when (a) the device transmits signals through a wire, cable, or other connection used in wire communications; or (b) the use or endeavor to use takes place on premises of a business that

26

operates in interstate or foreign commerce; or (c) such persons act in any territory of the United States; (3) intentionally disclosing or endeavoring to disclose, or intentionally using or endeavoring to use, the contents of any of the above communications knowing or having reason to know the information was obtained through an interception of a wire, oral, or electronic communication.[81]

135. Accordingly, the ECPA prohibits the interception, use, and disclosure of the content of the above communications.

136. The ECPA provides a private right of action to any person whose electronic communications are intercepted. 18 U.S.C. § 2520(a).

137. Plaintiff's phones, tablets, and computers constitute "devices" within the meaning of 18 U.S.C. § 2510(5).

138. Defendants violated the ECPA because they intentionally intercepted Plaintiff's and Class Members' private communications, which fall within the ECPA's definition of wire, oral, and electronic communications.

139. Defendants also violated the ECPA because they used, endeavored to use, and procured others to use Plaintiff's and Class Members' oral communications, which were transmitted through a device that transmits signals over a wire, line, or cable. The use of these communications occurred at locations operated by Defendants and their vendors, which are businesses that transact in interstate and foreign commerce and—when used by Defendants from their San Francisco location—this use occurred within the United States.

140. Defendants further violated the ECPA by intentionally disclosing and endeavoring to disclose the content of Plaintiff's and Class Members' private communications to third parties, including their vendors.

141. And Defendants violated the ECPA by intentionally using, and endeavoring to use, the content of Plaintiff's and Class Members' private communications, including to train AI models.

---

[81] The ECPA lists other circumstances where such use or endeavor to use violate the ECPA but are not listed here for brevity.

27

142.    In engaging in the above conduct, Defendants acted with a tortious and criminal purpose, and intended to violate state and federal constitutional and statutory provisions, including:

- A knowing intrusion upon Plaintiff's and Class Members' seclusion, including by monetizing and using these private communications for Defendants' own benefit;

- Violation of the California Invasion of Privacy Act ("CIPA");

- Violation of various state computer privacy and property statutes, including but not limited to the California Comprehensive Computer Data Access and Fraud Act ("CDAFA"), Cal. Penal Code § 502.

143.    The unauthorized interception and use of private communications—and endeavoring and procuring others to do so—for profit is tortious in and of itself.

144.    Defendants touted and advertised their AI notetaking software as hidden, allowing for the secret recording and interception of communications whereby "[o]ther people in the room won't know it's there."[82] Thus, Defendants cannot now claim ignorance of the tortious and criminal nature of their own acts.

145.    Plaintiff and Class Members seek all available relief for these violations, including statutory damages, punitive damages in an amount to be determined by a jury, and reasonable attorneys' fee and other litigation costs reasonably incurred pursuant to 18 U.S.C. § 2520.

**THIRD CLAIM FOR RELIEF**
**Violation of the California Invasion of Privacy Act ("CIPA")**
**Cal. Penal Code § 631**
**(On Behalf of the Plaintiff and the Nationwide Class)**
**(Against All Defendants)**

146.    Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

147.    The California Legislature enacted the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq.* ("CIPA"), finding that "advances in science and technology have led to the

_____

[82] *More Than Just an AI Meeting Assistant*, *supra* note 1.

development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id.* § 630. Thus, the intent behind CIPA is "to protect the right of privacy of the people of this state." *Id.*

148.    Cal. Penal Code § 631 imposes liability on any person who "by means of any machine, instrument, contrivance, or in any other manner" (1) "intentionally taps, or makes any unauthorized connection . . . with any telegraph or telephone wire, line, cable, or instrument," (2) "willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [the state of California]," (3) "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained," or (4) "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."

149.    Defendants are persons for purposes of § 631.

150.    Defendants maintain their United States headquarters in San Francisco, California, where they designed, contrived, agreed, conspired, effectuated, and received the interception, and used the contents of Plaintiff's and California Subclass Members' communications. Additionally, Defendants have adopted California substantive law to govern their relationship with users, and their interception of, at least, the content of Plaintiff's and California Subclass Members' communications occurred from their location and residence in California.

151.    Plaintiff's and California Subclass Members' computers, laptops, phones, tablets, and other devices, as well as Defendants' technology, each constitute a "machine, instrument, contrivance, or . . . other manner."

152. At all relevant times, Defendants, through their AI notetaking software, intentionally tapped or made unauthorized connections with the lines of internet communication utilized by Plaintiff and California Subclass Members without the consent of all parties to the communication.

153. Defendants, willfully and without the consent of Plaintiff and California Subclass Members, read or attempted to read, or learn the contents or meaning of Plaintiff's and California Subclass Members' communications while the communications were in transit or passing over any wire, line or cable, or were being received at any place within California, when they intercepted Plaintiff's and California Subclass Members' communications and data in real time.

154. Defendants used or attempted to use the content of the communications intercepted through their technology, including to train AI models.

155. Defendants also aided, employed, agreed with, and conspired with third parties to intercept and use Plaintiff's and California Subclass Members' private communications, including their vendors.

156. These communications were transmitted to, processed, and intercepted by Defendants in real time.

157. The interception of Plaintiff's and California Subclass Members' communications was without authorization and consent from Plaintiff and California Subclass Members. Accordingly, the interception was unlawful and tortious.

158. Plaintiff and the California Subclass Members seek statutory damages in accordance with § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiff and the California Subclass in an amount to be proven at trial, as well as injunctive or other equitable relief that may be proper.

159. Plaintiff and California Subclass Members have also suffered irreparable injury from these unauthorized acts. Plaintiff's and California Subclass Members' confidential and private data has been collected, viewed, accessed, used, and stored by Defendants, and has not been destroyed. Due to the continuing threat of such injury, Plaintiff and California Subclass Members have no

adequate remedy at law, and therefore, Plaintiff and California Subclass Members are entitled to equitable relief, including injunctive relief.

**FOURTH CLAIM FOR RELIEF**
**Violation of CIPA**
**Cal. Penal Code § 632**
**(On Behalf of the Plaintiff and the Nationwide Class)**
**(Against All Defendants)**

160.    Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

161.    Cal. Penal Code § 632 prohibits "intentionally and without the consent of all parties to a confidential communication," using "an electronic amplifying or recording device to eavesdrop upon or record the confidential communication."

162.    Plaintiff's and California Subclass Members' computers, laptops, phones, tablets, and other devices, as well as Defendants' technology, are electronic amplifying or recording devices for purposes of § 632.

163.    Section 632 defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto[.]"

164.    Plaintiff's and California Subclass Members' communications were confidential communications for purposes of § 632, including because Plaintiff and California Subclass Members had an objectively reasonable expectation of privacy that they would not be recorded in meetings without their consent.

165.    Plaintiff and California Subclass Members did not expect Defendants to secretly eavesdrop upon or record this information and their communications.

166.    By contemporaneously intercepting and recording Plaintiff's and California Subclass Members' confidential communications through their technology, Defendants eavesdropped and/or recorded confidential communications through an electronic amplifying or recording device in violation of § 632 of CIPA.

167. At no time did Plaintiff or California Subclass Members consent to Defendants' conduct, nor could they reasonably expect that their private communications would be overheard or recorded by Defendants.

168. Defendants utilized Plaintiff's and California Subclass Members' confidential and private data for their own purposes, including developing AI models.

169. Plaintiff and the California Subclass Members seek statutory damages in accordance with § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiff and the California Subclass in an amount to be proven at trial, as well as injunctive or other equitable relief that may be proper.

170. Plaintiff and California Subclass Members have also suffered irreparable injury from these unauthorized acts. Plaintiff's and California Subclass Members' confidential and private data has been collected, viewed, accessed, used, and stored by Defendants, and has not been destroyed. Due to the continuing threat of such injury, Plaintiff and California Subclass Members have no adequate remedy at law, and therefore, Plaintiff and California Subclass Members are entitled to equitable relief, including injunctive relief.

**FIFTH CLAIM FOR RELIEF**
**Violation of the Comprehensive Computer Data Access and Fraud Act ("CDAFA")**
**Cal. Penal Code § 502**
**(On Behalf of the Plaintiff and the Nationwide Class)**
**(Against All Defendants)**

171. Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

172. The California Legislature enacted CDAFA to "expand the degree of protection afforded. . . from tampering, interference, damage, and unauthorized access to [(including the extraction of data from)] lawfully created computer data and computer systems," finding and declaring that "the proliferation of computer technology has resulted in a concomitant proliferation of . . . forms of unauthorized access to computers, computer systems, and computer data," and that "protection of the integrity of all types and forms of lawfully created computers, computer systems,

32

and computer data is vital to the protection of the privacy of individuals . . ." Cal. Penal Code § 502(a).

173.    Plaintiff's and California Subclass Members' devices, including smart phones, tablets, and computers, constitute "[c]omputer systems" within the meaning of the CDAFA. *Id.* § 502(b)(5). The functionality of these devices constitute "[c]omputer services" within the meaning of the CDAFA. *Id.* § 502(b)(4).

174.    The data that Defendants accessed, used, and/or disclosed from Plaintiff's and California Subclass Members' devices constitute "[d]ata" within the meaning of the CDAFA. *Id.* § 502(b)(8) (defining data to mean "a representation of information, knowledge, facts, concepts, computer software, computer programs or instructions. Data may be in any form, in storage media, or as stored in the memory of the computer or in transit or presented on a display device.").

175.    Defendants violated § 502(c)(2) of the CDAFA by knowingly and without permission taking, copying, and making use of Plaintiff's and California Subclass Members' personal data, which came from their devices.

176.    Defendants violated § 502(c)(3) by knowingly and without permission causing the functionality of Plaintiff's and California Subclass Members' devices to be used for the purposes of obtaining, taking, copying, and using Plaintiff's and California Subclass Members' personal data.

177.    Plaintiff and California Subclass Members suffered damage and loss as a result of Defendants' conduct. Defendants' practices have deprived Plaintiff and the California Subclass Members of control over their valuable property (namely, their private data), the ability to receive compensation for that data, and the ability to withhold their data for sale. Defendants' practices have violated Plaintiff's and California Subclass Members' private interests by collecting, disclosing, and using their private data.

178.    Plaintiff and California Subclass Members also suffered harm because Defendants unjustly profited from this conduct, including unjust gains earned by selling their software, and from the private data used for (at least) Defendants' own business purposes for profit.

179. Plaintiff and California Subclass Members seek compensatory damages in accordance with CDAFA § 502(e)(1), in an amount to be proven at trial, and injunctive or other equitable relief.

180. Plaintiff and the California Subclass Members are entitled to punitive or exemplary damages pursuant to Cal. Penal Code § 502(e)(4) because Defendants' violations were willful and, upon information and belief, Defendants are guilty of oppression, fraud, or malice as defined in Cal. Civil Code § 3294. Plaintiff and California Subclass Members are also entitled to recover their reasonable attorneys' fees under § 502(e)(2).

## SIXTH CLAIM FOR RELIEF
### Unfair Competition Law ("UCL")
### Cal. Bus. & Prof. Code §§ 17200 *et seq.*
### (On Behalf of the Plaintiff and the Nationwide Class)
### (Against All Defendants)

181. Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

182. The UCL prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue, or misleading advertising." Cal. Bus. & Prof. Code § 17200.

183. Defendants are "person[s]" as defined by Cal. Bus. & Prof. Code § 17201.

184. Defendants violated the UCL by engaging in unlawful and unfair business acts and practices.

185. Defendants' "unlawful" acts and practices include their violation of the ECPA, CIPA, CDAFA, the common law right of privacy, and each of the other laws described herein.

186. Defendants' conduct violated the spirit and letter of these laws, which protect property and privacy interests and prohibit the unauthorized collection, use, and disclosure of private communications.

187. Defendants' "unfair" acts and practices include their (1) sale of a product with inherently privacy-invasive functionality that was hidden from ordinary consumers; and/or (2) the surreptitious interception, collection, and/or use of private communications without consent.

34

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

188.    Plaintiff and Class Members were completely unaware of Defendants' conduct and could not have anticipated Defendants' intrusion into their privacy through their unlawful and/or unfair practices. Accordingly, Plaintiff and Class Members could not avoid the harm Defendants caused.

189.    Defendants' conduct was immoral, unethical, oppressive, unscrupulous and substantially injurious to Plaintiff and Class Members. Further, the gravity of the harm of Defendants' secret collection, interception, and use of Plaintiff's and Class Members' private communications is significant, and there is no corresponding benefit resulting from such conduct.

190.    Plaintiff and Class Members suffered injury, damage, and loss as a result of Defendants' conduct. Defendants' practices have deprived Plaintiff and the Class Members of control over their objectively valuable property (namely, their private data), the ability to receive compensation for that data, and the ability to withhold their data for sale. Defendants' practices have violated Plaintiff's and Class Members' private interests by collecting, disclosing, and using their private data.

191.    Defendants unjustly profited from this conduct, including unjust gains earned by training AI models, and by selling their wiretapping software.

192.    Plaintiff and Class Members seek restitution and disgorgement of these unjust profits and revenues. Legal damages are inadequate to capture the full extent of Defendants' wrongdoing, their unjust benefits, and the harm their conduct caused to Plaintiff and Class Members. For example, Plaintiff's and Class Members' data can likely never be recovered from Defendants' systems, nor can Defendants return the unjust benefits it gained by training its AI models using this data. Restitution and disgorgement are thus appropriate to capture this wrongful conduct and irreparable harm.

193.    Plaintiff and Class Members seek all monetary and non-monetary relief allowed under the statute and equity, including restitution; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief permissible under the UCL.

## SEVENTH CLAIM FOR RELIEF
### Unjust Enrichment
### (On Behalf of Plaintiff and the Nationwide Class)
### (Against All Defendants)

194. Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

195. Defendants received benefits from Plaintiff and Class Members and unjustly retained those benefits at their expense.

196. Defendants received benefits from Plaintiff and Class Members in the form of the Plaintiff's and Class Members' highly valuable data, including their private communications, that Defendants wrongfully intercepted, disclosed, and used, including to train their own AI models, without authorization and proper compensation.

197. Defendants collected, intercepted, and used this data for its own gain, providing Defendants with economic, intangible, and other benefits, including the ability to train its AI and ML models and algorithms.

198. Had Plaintiff known of Defendants' misconduct, she would not have allowed herself to be recorded or demanded compensation.

199. Defendants unjustly retained these benefits at the expense of Plaintiff and Class Members because Defendants' conduct caused irreparable privacy harms, caused Plaintiff and Class Members to lose control of their private and valuable information, and placed them at an ongoing risk of future harm, all without providing any commensurate compensation to Plaintiff and Class Members.

200. The benefits that Defendants derived from Plaintiff and Class Members rightly belong to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles for Defendants to be permitted to retain any of the profit or other benefits they derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

201. Accordingly, Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds that Defendants

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

received, and such other relief as the Court may deem just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff on behalf of herself and the proposed Classes respectfully requests that the Court enter an order:

A.      Certifying the Classes and appointing Plaintiff as the Classes' representative;

B.      Finding that Defendants' conduct was unlawful, as alleged herein;

C.      Awarding declaratory relief against Defendants;

D.      Awarding such injunctive and other equitable relief as the Court deems just and proper;

E.      Awarding Plaintiff and the Class Members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

F.      Awarding Plaintiff and the Class Members pre-judgment and post-judgment interest;

G.      Awarding Plaintiff and the Class Members reasonable attorneys' fees, costs, and expenses; and

H.      Granting such other relief as the Court deems just and proper.

Dated: July 30, 2026

/s/ *Amber L. Schubert*
Robert C. Schubert #62684
Willem F. Jonckheer #178748
Amber L. Schubert #278696
Sonum Dixit #353395
**SCHUBERT JONCKHEER**
**& KOLBE LLP**
2001 Union Street, Suite 200
San Francisco, CA 94123
Tel: (415) 788-4220
Fax: (415) 788-0161
rschubert@sjk.law
wjonckheer@sjk.law
aschubert@sjk.law
sdixit@sjk.law

37

Christian Levis (*pro hac vice* forthcoming)
Amanda Fiorilla (*pro hac vice* forthcoming)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
clevis@lowey.com
afiorilla@lowey.com

38